

**WILENCHIK & BARTNESS**
— A PROFESSIONAL CORPORATION —

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone: 602-606-2810        Facsimile: 602-606-2811

Dennis I. Wilenchik, #005350
admin@wb-law.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brad S. Karp (*pro hac vice*)
Susanna M. Buergel (*pro hac vice*)
Gregory F. Laufer (*pro hac vice*)
Alison R. Benedon (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
bkarp@paulweiss.com
sbuergel@paulweiss.com
glaufer@paulweiss.com
abenedon@paulweiss.com

*Attorneys for Defendants*
*Mark A. Russell and Michael Lohscheller*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Tenneson, Individually and On Behalf of all Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> Mark A. Russell and Michael Lohscheller, <br><br> Defendants. | Case No.: 2:23-cv-02131-PHX-DJH (DMF) <br><br> **DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULES 9(b) AND 12(b)(6)** <br><br> **(Oral Argument Requested)** |

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"), Defendants Mark A. Russell and Michael Lohscheller, former officers of Nikola Corporation ("Nikola" or the "Company"), respectfully move to dismiss the Amended Complaint (the "Complaint").

## PRELIMINARY STATEMENT

In the early morning hours on June 23, 2023, a battery electric semi-truck called the Tre BEV that was parked at electric vehicle manufacturer Nikola's headquarters caught fire. Although Nikola initially announced that it suspected foul play, it updated its announcement after a preliminary investigation conducted by an independent third party concluded that the fire was caused by a coolant leak inside the truck's battery pack.  Nikola promptly recalled the affected trucks, and its stock price fell. Plaintiff—a single Nikola shareholder—evidently having read the word "fire" in the news, precipitously initiated this lawsuit in a blatant attempt to reverse-engineer a fraud out of whole cloth. With input from a single disgruntled former Nikola employee who had left the Company months *before* the incident at issue and who had had no involvement in its investigation or the Company's subsequent actions and disclosures, Plaintiff has brought this action claiming that because Nikola's engineering team once evaluated a *different* potential battery defect that had nothing to do with the defect that caused the incident here, Defendants somehow defrauded the market by selling trucks they knew would eventually catch fire.

Plaintiff's Complaint—based on one inherently unreliable source and a facially absurd theory of fraud unsupported by any particularized facts—was threadbare from the start. But now, with the passage of time, the Complaint's fundamental defects have only come into sharper relief. Specifically, Nikola has since filed for bankruptcy, after which Plaintiff voluntarily dismissed his claims against the Company—the only speaker actually responsible for certain alleged misstatements that were central to the Complaint.  With Nikola's dismissal, Plaintiff's entire sensationalized theory of falsity went up in flames (so to speak). What remains of the Complaint should be dismissed because it does not remotely meet the exacting standards for pleading securities fraud.

*First*, Plaintiff has failed to plead that Defendants acted with scienter. Plaintiff claims that

1

Russell and Lohscheller, who served in succession as Nikola's CEO, intended to defraud the market by pushing supposedly defective Tre BEV trucks out to the market because they were compensated primarily with Nikola stock and were thus motivated to inflate Nikola's stock price. This theory of fraud is illogical on its face: why would Defendants sell trucks that were at imminent risk of catching on fire, an event that would obviously become public, generate significantly adverse news, and almost certainly cause Nikola's stock price to drop? Such a scheme could make sense *only if* Defendants intended to profit from Nikola's artificially inflated stock price in the short term—before any such fire and consequent stock price drop—but Plaintiff pleads nothing of the sort. Plaintiff's scienter allegations as to Lohscheller otherwise rest on the incoherent story of a single confidential witness who left the Company under a dark cloud months before the events at issue occurred and who therefore has no personal knowledge about them. As to Russell, all Plaintiff can muster is that if Lohscheller knew of a defect, he supposedly must have informed Russell about it too. But Plaintiff pleads no facts showing that Lohscheller ever shared such information with Russell, much less that Lohscheller actually had any such knowledge to share. These allegations, viewed either individually or holistically, fail to give rise to even a weak inference of scienter, let alone a strong inference as required by law.

*Second*, Plaintiff fails to plead a materially false or misleading statement. As Plaintiff does not dispute, Defendants accurately disclosed that after years of rigorous development and testing, Nikola was in fact producing and delivering electric semi-trucks. Plaintiff nonetheless alleges it was misleading for Defendants to announce Nikola's commercial progress and suggest its sales of Tre BEVs were a positive development. But it *was* a positive development, and Defendants *did* disclose the risks inherent to bringing electric semi-trucks to the market, including, *specifically*, the risks associated with batteries and the risk of a recall (risks that would be known to any reasonable investor anyway). Plaintiff nevertheless claims these disclosures were insufficient because Defendants knew the risk existed at the time of the disclosure. But Plaintiff has not alleged, as he was required to do, that the risk had actually *come to fruition* at the time of the disclosure. Indeed, the supposedly known risk—that the Tre BEV batteries may experience catastrophic failure when exposed to "vibrations" from driving—*never* actually manifested.

2

*Third*, the Complaint's threadbare allegations fall far short of pleading loss causation. More specifically, the Complaint does not allege a single corrective disclosure that revealed an earlier statement to be false or misleading, does not allege that a concealed risk actually materialized, and does not attempt to plead loss causation by any other means. That failure is an independent basis for dismissal.

*Fourth*, absent a viable Section 10(b) claim—which is not present here—Plaintiff's Section 20(a) "control person" claim necessarily fails. In any event, and as this Court previously recognized, Plaintiff's control person claim does not work in light of Nikola's dismissal.

## FACTUAL BACKGROUND[1]

Nikola was an electric vehicle company focused on the design and manufacturing of battery-electric ("BEV") and fuel-cell electric ("FCEV") semi-trucks. ¶ 21. In September 2020, Nikola's founder, Trevor Milton, departed the Company after a short-seller published a report claiming Milton had made false and misleading statements to the market about Nikola's technology and manufacturing abilities. ¶¶ 1, 24. Defendant Mark Russell became CEO in June 2020, ¶ 15, and Milton has not been associated with Nikola, other than as a Nikola shareholder, since that time. Milton was indicted for securities and wire fraud in July 2021, and was sentenced to four years in prison and a $1 million fine after being convicted in December 2023. ¶ 21.

After Milton's departure from the Company, Nikola successfully brought its BEV semi-trucks to market in April 2022. ¶ 39. Nikola was committed to safety in the development and production phases of its trucks, as evidenced by its thorough multi-faceted testing, which included front, side and rear crash testing, battery coolant leakage monitoring, and battery thermal runaway detection. ¶ 128. And, Nikola's trucks continuously met and exceeded federal motor vehicle safety standards and the industry's best practices. *Id.* By summer 2023, Nikola had been delivering its

---

[1] The Factual Background is drawn from allegations in the Complaint, which are assumed to be true for purposes of this Motion only. *See Outdoor Media Grp., Inc.* v. *City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). Unless otherwise indicated, citations to "¶ _" refer to the Complaint. Citations to "Ex. _" refer to the exhibits to the Laufer Declaration attached hereto as "**Exhibit A**". Unless otherwise noted, emphases are added and internal citations and quotation marks omitted.

BEV semi-trucks for approximately 14 months, with more than 200 vehicles out on the road for commercial use.  ¶¶ 39, 49.

As Nikola repeatedly disclosed to the market, designing and manufacturing BEV and FCEV semi-trucks was not without risks.  Nikola's quarterly and annual SEC filings, which Russell and Lohscheller signed during their respective tenures as CEOs, therefore made robust risk disclosures, including that "[o]nce production commences, our trucks may contain defects in design and manufacture that may cause them not to perform as expected or may require repair"— including, specifically, that lithium-ion battery cells carry a known risk of "catch[ing] fire"—and "[i]n the future, we may voluntarily or involuntarily, initiate a recall if any of our vehicles or electric powertrain components (including the fuel cell or batteries) prove to be defective[.]" ¶¶ 67, 78, 86, 98, 110, 125; Ex. 1 at 45–48; Ex. 2 at 29–33.[2]

On June 23, 2023, a Tre BEV parked behind the Company's headquarters caught fire, and the fire spread to four other trucks.  ¶¶ 6, 45, 49. Based on video surveillance from the time of the fire, Nikola initially suspected that the fire may have been caused by foul play.  ¶¶ 45, 49. Nikola therefore released a Tweet stating its suspicions and noting that an investigation was underway. *Id.*  On August 4, 2023, while the investigation was ongoing, then-CEO Lohscheller resigned from his position as CEO and from the Company's Board of Directors due to a family health matter. ¶ 47; Exs. 3, 4.

On August 11, 2023, Nikola announced the preliminary results of the independent investigation into the June 23 battery fire: a single supplier component within the battery pack was the likely source of a coolant leak within the pack, which caused a combustive event. ¶¶ 49, 51. This preliminary conclusion was supported by the minor thermal event that had occurred the day prior, when a battery pack in another Nikola truck experienced a fire at the Company's Coolidge, Arizona manufacturing plant. ¶ 49. Within 24 hours of receiving the preliminary investigation findings, Nikola issued a voluntary recall and recommended courses of actions to protect its customers and keep as many trucks as possible in operation. *Id.* Nikola's

---

[2] The Court may take judicial notice of SEC filings and earnings call transcripts not incorporated into the Complaint. *Bajjuri* v. *Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 745 (D. Ariz. 2022).

President and CEO Steve Girsky stated, "[a]t Nikola we take safety very seriously. We stated from the beginning that as soon as our investigations were concluded we would provide an update, and we will continue our transparency as we learn more." *Id.* On August 21, 2023, Nikola filed a Form 8-K offering further information and explaining that the recall could cause the Company to "incur significant expenses . . . and there can be no assurance as to when we will be able to resume production of our BEV trucks. As a result, our brand, business, results of operations, financial condition and cash flows may be adversely affected." ¶ 51.

On September 4 and 8, 2023—a month after Lohscheller left Nikola—two additional Tre BEVs caught fire, one at a warehouse in Tempe, Arizona, and the other near the Company's headquarters. ¶¶ 53, 54. In a fireside chat on September 13, 2023, Girsky stated:

> Since June, there have been several thermal incidents with our battery electric trucks. . . . Our engineering and safety teams are working around the clock to ensure the safety of our trucks and the public, and we are taking further precautions by deploying teams to our active fleets to physically monitor the trucks in service. We have not encountered any concerns with those trucks that are in operation and we remain focused on maintaining ongoing communications with our customers and dealers to make sure they have all their questions answered and that they are confident in our trucks and satisfied with their performance.

Ex. 5 at 2. Plaintiff does not challenge Girsky's statements as false or misleading.

### PROCEDURAL HISTORY

Plaintiff initially brought this action against Nikola, Lohscheller, and Russell. In July 2024, Defendants moved to dismiss the Complaint. ECF No. 34. In February 2025, while that motion was pending, Nikola filed a Notice of Suggestion of Bankruptcy and Automatic Stay of Proceedings informing the Court of its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. ECF No. 44. In February 2025, the Court stayed the claims against Nikola and denied the pending motion to dismiss without prejudice and with leave to re-file within 14 days of the bankruptcy stay being lifted. ECF No. 45. Plaintiff thereafter voluntarily dismissed Nikola from the action. ECF No. 46. In March 2025, Defendants moved to stay the action against them pending resolution of Nikola's bankruptcy proceedings. ECF No. 49. Plaintiff opposed Defendants' motion. ECF No. 51. The Court thereafter denied the motion to stay. ECF No. 53.

**ARGUMENT**

To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must plead with particularity "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Rule 9(b) "applies to all elements of a securities fraud claim." *Or. Pub. Emps. Ret. Fund* v. *Apollo Group Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). Under this heightened pleading standard, Plaintiff must allege the "who, what, when, where, and how" of the alleged fraud. *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024). Plaintiff must also satisfy the "exacting standard" prescribed by the PSLRA, which further "reinforces Rule 9(b)." *Id.*

## I.      PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

To adequately plead scienter under binding Ninth Circuit precedent, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 619–20 (9th Cir. 2017); *Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (pleading scienter is "exacting" and "no small hurdle"). The scienter analysis is comparative: a court "must take into account plausible opposing inferences," and scienter is pled only if the inference is "cogent and at least as compelling as any opposing inference." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). In addition, Plaintiff must "allege scienter with respect to each of the individual defendants." *Or. Pub. Emps.*, 774 F.3d at 607. "[I]f the complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in establishing scienter." *Prodanova* v. *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021). In conducting this analysis, the Court should first "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and if no allegation is adequate on its own, the Court should also "conduct a 'holistic' review" of the allegations. *Or. Pub. Emps.*, 774 F.3d at 607.

Whether viewed individually or holistically, the allegations in the Complaint do not give

rise to a strong inference of scienter as to either Defendant under these governing standards.

A.     **Plaintiff Has Not Alleged a Plausible Motive**

Plaintiff attempts to plead motive by theorizing that Defendants knew the Tre BEV batteries had a defect that would result in catastrophic failure after roughly 12 months of use, but they were "incentivized to conceal material adverse non-public information" because Russell's and Lohscheller's compensation was "heavily dependent on the value of Nikola's stock." ¶¶ 142–43. But the fact that Russell and Lohscheller, like many executives of emerging technology companies, were compensated primarily through restricted stock units is in no way enough to make out a strong inference of scienter. To the contrary, the Ninth Circuit has made clear that a motivation to keep a company's stock price high, standing alone, does ***not*** give rise to a strong inference of scienter. *See Zucco*, 552 F.3d at 1005 ("simple allegations of pecuniary motive" not enough to establish scienter); *see also Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002); *City of Pontiac Gen. Emps. Ret. Sys.* v. *First Solar Inc.*, 2023 WL 155861, at *8 (D. Ariz. Jan. 11, 2023) ("[T]he bare assertion that the Individual Defendants were financially motivated to defraud because their executive-level bonuses were based in part on [a technological achievement] does not present a strong inference of scienter."). Accordingly, Plaintiff's compensation-related motive theory is squarely foreclosed by binding precedent.

Further, Plaintiff alleges that Defendants were aware of a particular defect that was essentially a ticking time bomb, and would ultimately be more costly for Nikola in the long term. ¶¶ 35–37, 68. But this motive theory makes no sense absent particularized factual allegations that Russell and Lohscheller had actually sought to profit from an artificially inflated stock price *in the short term* before any defect became publicly known—meaning allegations showing that they pumped up the stock and sold their shares at a profit before the company's stock price fell.

In fact, the Ninth Circuit has specifically rejected similarly nonsensical motive allegations. In *Endologix*, the plaintiffs alleged that a medical device company had misled the market about the likelihood that the FDA would approve its device. 962 F.3d at 415. The Ninth Circuit noted that the "theory does not make a whole lot of sense" because the concealed information regarding the FDA would eventually come to light. *Id.* Such a theory "depends on the supposition that

7

defendants would rather keep the stock price high for a time and then face the inevitable fallout" and "might have more legs" if the defendants had "sought to profit from this scheme in the interim." *Id.* Absent such factual allegations, "the more plausible inference is that the company made optimistic statements about its prospects for FDA approval . . . not because the company was quixotically seeking FDA approval for a medical device application it knew was destined for defeat." *Id.* at 408, 415.

Similarly, in *Joyce* v. *Amazon.com, Inc.*, 2023 WL 8370101 (W.D. Wash. Dec. 4, 2023), the plaintiffs alleged that Amazon concealed allegedly anticompetitive conduct to avoid fines that the government would impose for such conduct. *Id.* at *11. The court concluded that the plaintiffs failed to allege a plausible motive because they "d[id] not explain how lying to investors would have changed the outcome of such investigations or decreased the likelihood of fines," but the theory "would be more plausible" if the defendants "had sought to profit in the meantime, such as by selling their stock or selling the company at a premium." *Id.*

The Complaint here suffers from the same fatal defects, as Plaintiff does not plead any facts explaining how Defendants sought to benefit themselves at the expense of the market before the supposed defect (according to Plaintiff) necessarily materialized. *Cai* v. *Eargo, Inc.*, 2025 WL 66041, at *2 (9th Cir. 2025) ("the lack of advantageous stock sales during the [class period] does not support an inference of scienter and in fact supports the opposite inference"). "The PSLRA neither allows nor requires [a court] to check [its] disbelief at the door." *Endologix*, 962 F.3d at 415. As such, Plaintiff's "failure to plead a plausible narrative" to explain why Defendants would engage in the purported fraud should "cut[] strongly against the inference of scienter." *Joyce*, 2023 WL 8370101, at *11.

**B.    Plaintiff Has Not Alleged Any Direct Evidence of Scienter**

Plaintiff also fails to allege particularized facts suggesting that either Russell or Lohscheller was aware that his statements were false or misleading at the time they were made. *See City of Dearborn Heights*, 856 F.3d at 620 (no scienter absent allegation that defendants had "direct knowledge" of contradictory information); *Baker* v. *Twitter, Inc.*, 2023 WL 6932568, at *10 (C.D. Cal. Aug. 25, 2023) ("Because there is no indication that the speaker of these statements was

8

aware they were false at the time they were made, Lead Plaintiff has not adequately alleged scienter."). More specifically:

**Lohscheller**. Plaintiff's allegations regarding Lohscheller are based entirely on a single confidential witness, identified in the Complaint as CW1, but CW1's purported views are entitled to absolutely no weight under applicable law—even on a motion to dismiss. That is because the Ninth Circuit has held that where, as here, a complaint relies on a confidential witness without "documentary evidence" corroborating his account, the confidential witness can be relied on *only* if the complaint "provide[s] an adequate basis for determining that the witnesses in question ha[s] personal knowledge of the events they report." *Zucco*, 552 F.3d at 995. To make that assessment, courts consider: (i) "the level of detail provided by the confidential sources"; (ii) "the corroborative nature of the other facts alleged (including from other sources)"; (iii) "the coherence and plausibility of the allegations"; (iv) "the number of sources"; (v) "the reliability of the sources"; and (vi) "similar indicia." *Id.*[3]

Due consideration of these factors here precludes reliance on CW1: (i) CW1 does not describe in detail the purported defect he allegedly flagged, and instead only vaguely says that the "battery packs used to house the battery cells . . . did not keep them secure," ¶ 35; (ii) Plaintiff offers no corroborating allegations whatsoever, including in the form of any documentary evidence; (iii) CW1's story is utterly incoherent: Plaintiff claims CW1 flagged a defect that posed a risk of catastrophic failure from "vibration during use (i.e., driving)," ¶ 35, yet the actual fires that transpired—four months after CW1 had left Nikola—occurred not in commercial vehicles that had been out on the road ("i.e., driving") but rather in parked vehicles that were still undergoing testing, ¶¶ 49, 53–54. It is also entirely implausible that Nikola would sell trucks they

---

[3] Plaintiff may argue that Defendants were able to ascertain CW1's identity, so the Court need not assess his reliability as a confidential witness. *See* ECF No. 42. But courts consider a witness's reliability regardless of whether defendants can readily deduce the witnesses' identities. *See Zucco*, 552 F.3d at 996 (applying above factors and concluding that CWs "described . . . with a large degree of specificity" were nevertheless "not reliable"); *see also Rahman* v. *Kid Brands, Inc.*, 736 F.3d 237, 240 n.2, 244 (3d Cir. 2013) (evaluating CWs under similar standard even where "it [was] difficult to understand how . . . [defendant] could not be aware of their identities").

knew would ultimately catch fire; (iv) CW1 is the *only* confidential witness cited in the Complaint (which is particularly striking given how many people are alleged to have attended meetings where CW1 purportedly expressed concerns, *see, e.g.*, ¶¶ 35, 38, 43, and all the more surprising given how many former Nikola employees there are who actually *did* have involvement with the fire and its aftermath); (v) CW1 is an inherently unreliable source, as it is apparent from the face of the Complaint that he is nothing more than a disgruntled former employee who left the company under a pall and who believes (falsely) that he was retaliated against, ¶ 44; and (vi) CW1 left the Company *before* many of the alleged misstatements were made, so could not possibly know whether they were true at the time made.  The Court should therefore disregard CW1 entirely.

**Russell**.   The allegations with respect to Russell are even more threadbare.  Indeed, Plaintiff all but leaves Russell out of the Complaint even while publicly accusing him of fraud. Plaintiff speculates, without any proffered basis whatsoever, that Lohscheller "***would have told Russell about the battery defects during regular meetings similar to how Russell reported to ex-CEO Trevor Milton about the status of Nikola's products and technology before replacing him as CEO***."   ¶ 38.   But, as already shown, the Complaint makes no plausible allegations that Lohscheller knew of but concealed any battery problems and therefore had nothing to tell Russell. But just as critically, there are no factual allegations suggesting that anything of the sort actually happened.  Such speculation about what Russell hypothetically "would have [been] told" based on Russell's supposed relationship with a different person in a different position at a different point in time is plainly insufficient to satisfy the exacting requirements of the PSLRA and Rule 9(b).  *See Curry* v. *Yelp*, 875 F.3d 1219, 1227 (9th Cir. 2017) (requiring "detailed and specific allegations about management's exposure to factual information"); *Zucco*, 552 F.3d at 998 (rejecting confidential witness statement that former CEO "had to have known what was going on"); *Bao* v. *SolarCity Corp.*, 2016 WL 4192177, at *10–11 (N.D. Cal. Aug. 9, 2016) (rejecting conclusory allegation that "everybody at the high level knew" about issue as "merely speculative"), *aff'd*, 884 F.3d 884 (9th Cir. 2018).

### C.    Plaintiff's Additional Allegations with Respect to Lohscheller Fail

Plaintiff includes two additional half-baked theories of scienter, both of which fail.

*First*, Plaintiff concocts a theory that Lohscheller was actually terminated for cause due to the defect in Nikola's batteries rather than leaving for family health reasons, as publicly disclosed. ¶¶ 146–49; Ex. 4 at 2. But that manufactured hypothesis, unsupported by any facts or sources whatsoever, is irreconcilable with governing law. *See Zucco*, 552 F.3d at 1002 ("[A] plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one. Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter."); *Bolling* v. *Dendreon Corp.*, 2014 WL 2533323, at *14 (W.D. Wash. June 5, 2014) (refusing to "indulge" the "inference" that defendants "knew" and "took steps to illegally conceal" relevant fact from the public).

*Second*, Plaintiff alleges that Lohscheller's purported response to an unrelated e-axle engineering issue that CW1 allegedly flagged, and the mere fact that Lohscheller was experienced in the automotive industry and therefore knew about the Highway Traffic Safety Administration regulatory scheme, raise an inference of scienter. ¶¶ 130–38. This theory rests entirely on CW1's allegations, and so should be disregarded for the reasons set out above. But even if they are credited, Plaintiff does not allege that there *ever* was a problem with the Tre BEVs' e-axle technology, further supporting the more compelling inference that Lohscheller had *correctly* assessed an engineering issue that CW1 misunderstood. In any event, the *e-axle* anecdote cannot support a plausible inference that Lohscheller intentionally misled the market regarding Nikola's *battery* technology—those are, needless to say, two different things entirely. *See Joyce*, 2023 WL 8370101, at *14; *In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1214 (W.D. Wash. 2009) ("Plaintiff must plead, in great detail, facts that constitute circumstantial evidence of deliberately reckless or conscious misconduct"). Nor can Lohscheller's purported knowledge of a regulatory scheme—which is not even alleged to have been violated—support scienter, as the "federal securities laws do not require a company to accuse itself of wrongdoing." *In re Volkswagen Clean Diesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 258 F. Supp. 3d 1037, 1043 (N.D. Cal. 2017).

Even when viewed holistically, the allegations in the Complaint do not give rise to a strong inference of scienter, and the Complaint should therefore be dismissed in its entirety.

## II.    PLAINTIFF HAS FAILED TO PLEAD ANY ACTIONABLE MISSTATEMENTS

To plead an actionable misstatement, Plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1); *In re Cloudera*, 121 F.4th at 1187.  Importantly, the Complaint "cannot rely on hindsight; rather, it must explain why the statements were false or misleading at the time they were made." *Id.*    With Nikola's dismissal, there are two types of challenged statements that remain: (i) statements about the production, shipment, and delivery of Tre BEV trucks, which allegedly "portrayed Nikola's shipment of defective trucks to customers as a positive development"; and (ii) statements disclosing the risks that trucks "may not perform consistent with customers' expectations" and that the Company "may . . . initiate a recall if any of our vehicles or electric powertrain components (including the fuel cell or batteries) prove to be defective."[4]  Not a single one of the alleged misstatements is adequately alleged to be false.

### A.    Statements Regarding Tre BEV Production and Sale Are Not Actionable[5]

For a statement to be false or misleading, it must "directly contradict what the defendant knew at that time" or "omit[] material information" that a company is required to disclose. *Khoja* v. *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018).  "[Q]ualified and factually true" statements are not false and misleading, and "a statement is not actionable just because it is incomplete." *Weston Fam. P'ship LLLP* v. *Twitter, Inc.*, 29 F.4th 611, 615, 619 (9th Cir. 2022). "[C]ompanies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development." *Id.* at

---

[4] Certain alleged misstatements that are set forth in paragraphs 92, 100, 102, 114, 117, and in portions of paragraphs 59, 80, 104, and 119, are not attributable to either of the Defendants, but solely to Nikola.  Therefore, with Nikola's dismissal, those statements are no longer at issue in this action and are not addressed here. *See Janus Cap. Grp., Inc.* v. *First Deriv. Traders*, 564 U.S. 135, 142 (2011) (holding that only the "maker" of a statement may be held liable under Section 10(b) and Rule 10b–5).

[5] *See* ¶¶ 57, 60, 65, 70, 73, 76, 81, 84, 89, 93, 96, 99, 103, 105, 108, 118, 123.

620.    Plaintiff does not allege that any of the statements regarding Nikola's production—for example, "[o]n March 21, 2022, we started serial production of the Nikola Tre BEV" and "[i]n 2022, we produced 258 Tre BEV trucks and shipped 131 Tre BEV trucks"—were actually false. ¶¶ 63, 95.    To the contrary: Plaintiff has already conceded that Defendants' statements were "technically true." ECF No. 42 at 9.    Instead, Plaintiff claims they were misleading because they failed to disclose that "Tre BEV trucks were not marketable to customers and, consequently, the Company was exposing itself and its investors to significant regulatory risk and liability by selling them into the market." *See, e.g.*, ¶¶ 62–65, 75–79.    These statements are not actionable.

*First*, Plaintiff has not adequately pleaded that there *was* anything to disclose when the statements were made, as the Complaint's only source of information should not be credited.  *See supra* I.B.    In any event, CW1 left the Company *before* seven of the alleged misstatements were made.  ¶ 44.  *Lew* v. *ON Semiconductor Corp.*, 2025 WL 1918543, at *15 (D. Ariz. July 11, 2025) (CW-sourced allegations regarding certain alleged misstatements were "unavailing" because CW "was no longer with the company when [those] statements were made").

*Second*, to the extent there was a risk that Tre BEV batteries could experience a thermal event—a risk that *always* exists with lithium-ion batteries—Nikola *did* disclose it, *specifically and repeatedly*, as the Complaint itself admits.  ¶¶ 67, 78, 86, 98, 110; Ex. 1 at 45–48; Ex. 2 at 29–33.    Nikola publicly explained that "[o]nce production commences, our trucks may contain defects in design and manufacture that may cause them not to perform as expected or may require repair," that "[t]here can be no assurance that we will be able to detect and fix any defects . . . prior to commencing customer sales," and that a recall "may result in adverse publicity, damage our brand and materially adversely affect our business, prospects, operating results and financial condition."  ¶ 67.    Nikola also *specifically* disclosed that "[t]he battery packs within our trucks will make use of lithium-ion cells" which "[o]n rare occasions, . . . can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells."  Ex. 1 at 48; Ex. 2 at 33.    Nikola then disclosed the first thermal event within hours of it happening, ¶ 115, and, shortly after a preliminary investigation indicated the fire was likely attributable to a coolant leak, Nikola refined its risk disclosures to account for the

events in question. ¶ 51. To state the obvious: "[o]mission theories are not viable when the Defendants clearly disclosed material information to investors." *In re AnaptysBio, Inc. Sec. Litig.*, 2021 WL 4267413, at *5 (S.D. Cal. Sep. 20, 2021); *see also Sneed* v. *Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) ("A reasonable investor cares about a statement's surrounding text, including hedges, disclaimers, and apparently conflicting information.").

*Third*, even if (contrary to fact) there were an omission, "omissions are only actionable where they cause the statements actually made to be misleading." *Lomingkit* v. *Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1162–63 (D. Ariz. 2017). In other words, omitting that Tre BEV batteries could experience failure within 12 months absent a fix could only be misleading if it caused statements like "[o]n March 21, 2022, we started serial production of the Nikola Tre BEV at our Coolidge, Arizona manufacturing facility" and "[i]n 2022, we produced 258 Tre BEV trucks and shipped 131 Tre BEV trucks to our dealer network" to be misleading. ¶¶ 63, 95. Those statements are factually true regardless of whether there was a risk of battery failure, and simply uttering the words "Tre BEV" did not give rise to an obligation to make further disclosure. Courts recognize that "[m]erely mentioning a topic does not require the company to disclose every tangentially related fact that might interest investors." *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 886 (N.D. Cal. 2020).

*Fourth*, statements touting Nikola's manufacturing and delivery successes—such as "[Nikola's] battery electric truck is in the marketplace and performing well for our customers," ¶ 112—are "general, subjective, and extremely unlikely to induce consumer reliance." *A.H. Lundberg Assoc., Inc.* v. *TSI, Inc.*, 2014 WL 5365514, at *6 (W.D. Wash. Oct. 21, 2014); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (statement "we believe our employee relations are good" is inactionable puffery); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 835 (N.D. Cal. 2019) (statements such as "we are very pleased with the learning from our pilot launch," and "so far we are getting really great feedback" are "inactionable puffery"). Likewise, statements like "Nikola trucks are designed with safety as the first priority and are rigorously tested prior to release," ¶ 128, are too vague to be actionable. *See Lomingkit*, 2017 WL 633148, at *23 (statements about "general legal compliance" are "too vague").

14

There can be no claim for securities fraud when Defendants simply made true statements about the production, shipment, and delivery of Tre BEV trucks.

**B.     Risk Disclosures Regarding Truck Batteries Are Not Actionable[6]**

Plaintiff alleges that Nikola's disclosures that trucks "may not perform consistent with customers' expectations" and that the Company "may . . . initiate a recall if any of our vehicles or electric powertrain components (including the fuel cell or batteries)" were false and misleading because "Nikola knew the Tre BEV trucks already contained a material defect concerning their batteries." *E.g.*, ¶¶ 67–68.  While "[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors," *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021), such risk disclosures are only misleading if the risk *has* "come to fruition." *Id.*  Where no risk has come to fruition or a *different* risk has appeared in the interim, the risk disclosures are not misleading.  *See Williams* v. *Globus Med., Inc.*, 869 F.3d 235, 242–43 (3d Cir. 2017) (dismissing claim alleging falsity of risk factor statements because plaintiffs "failed to adequately plead that the risk about which [the company] warned . . . had actually materialized at the time" the risk factor statements were made).

Plaintiff has not adequately alleged that the supposedly concealed risk—catastrophic failure caused by vibration after approximately 12 months of use—had actually materialized at the time the statements were made.  In fact, Plaintiff has not pleaded that that risk *ever* came to fruition.  Even if the Court credits CW1's allegations—and it should not—the fires that actually transpired had nothing to do with "vibrations" and, other than the fact that they both relate to batteries on the Tre BEV, are entirely unrelated to the defect CW1 supposedly flagged.

Because Plaintiff has not alleged any false or misleading statements or omissions, the Complaint should be dismissed.

**III.     PLAINTIFF FAILS TO PLEAD LOSS CAUSATION**

"To establish loss causation in a fraud-on-the-market case, the plaintiff must show that

---

[6] *See* ¶¶ 67, 78, 86, 98, 110, 125.

after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *Irving Firemen's Relief & Ret. Fund* v. *Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021). "This proof is often made by identifying one or more corrective disclosures." *Espy* v. *J2 Glob., Inc.*, 99 F.4th 527, 540 (9th Cir. 2024). To be sure, loss causation is "a context-dependent inquiry," such that courts "take a flexible approach in evaluating whether some event or occurrence revealed fraud to the market." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024). In every case, however, the plaintiff must "allege with particularity" that the defendant's "misstatement, as opposed to some other fact, foreseeably caused [the plaintiff's] loss." *Espy*, 99 F.4th at 540. The Complaint contains a grand total of four paragraphs purporting to show loss causation both by corrective disclosure and materialization of a concealed risk. ¶¶ 154–57. These empty and perfunctory allegations fail.

### A.      Plaintiff Does Not Allege Any Corrective Disclosures

To adequately allege loss causation with a corrective disclosure, Plaintiff must "allege with particularity facts plausibly suggesting" that (1) "a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements," and (2) "that disclosure caused the company's stock price to decline." *Espy*, 99 F.4th at 540. To be "corrective," the disclosure must "relate back to the misrepresentation and not to some other negative information about the company." *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan* v. *First Solar Inc.*, 2023 WL 4161355, at *6 (D. Ariz. June 23, 2023). Accordingly, Plaintiff is required to "specify which of the Defendants' statements were made untrue" by a purported disclosure. *Or. Pub. Emps.*, 774 F.3d at 608.

Plaintiff generally alleges that "Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market," ¶ 154, but makes no effort whatsoever to explain which statements were corrected by any purported corrective disclosure. *See, e.g.*, ¶ 46 (alleging stock drop "follow[ed] news of the fire" but not identifying what "truth" was revealed). This is an independent basis for dismissal. *E.g.*, *Borteanu* v. *Nikola Corp.*, 2023 WL 1472852, at *37 (D. Ariz. Feb. 2, 2023) ("Plaintiff has failed to sufficiently allege loss

causation because—by not specifying which misstatements or omissions were implicated in each alleged corrective disclosure—Plaintiff failed to plausibly allege a causal connection between Defendant[s'] alleged misrepresentations and the injuries suffered by Plaintiff.").

### B.    Plaintiff Does Not Plead a Materialization of the Risk Theory

Nor can Plaintiff rely on the materialization of the risk theory of loss causation. *See* ¶ 156. Under this theory, loss causation may be shown where "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of a security." *Nuveen Mun. High Income Opportunity Fund* v. *City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). But neither the Ninth Circuit nor any court in the District of Arizona has adopted this theory of loss causation. *Id.* at 1122 n.5; *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 n.6 (9th Cir. 2022); *Palm Harbor*, 2023 WL 4161355, at *8.

In any event, Nikola *specifically and repeatedly disclosed* the risks that Plaintiff contends they hid. *See supra* II.B; *see also* ¶¶ 67, 78, 86, 98, 110, 125; Ex. 1 at 45–48; Ex. 2 at 29–33. Plaintiff's materialization of the risk theory thus fails as a matter of law. *See Yaron* v. *Intersect ENT, Inc.*, 2020 WL 6750568, at *9–10 (N.D. Cal. June 19, 2020) (rejecting loss causation allegations absent allegation that defendants concealed a "*hidden* risk . . . as opposed to known risks" about which defendants "extensively warned" investors). Additionally, Plaintiff has not alleged that the risk that purportedly "materialized" (fire caused by coolant leak) even *is* the same risk that was allegedly concealed (fire caused by battery security). Because the fires were not the result of the risk that Plaintiff alleges Defendants concealed, Nikola's announcement of the fire cannot "be reasonably read to reveal" the fraud Plaintiff alleges. *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).

### IV.    PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED

The Court previously concluded that Plaintiff's Section 20(a) claim could not proceed against Defendants in Nikola's absence. ECF No. 45 at 2. Plaintiff's Section 20(a) claim must also be dismissed because there is no underlying Section 10(b) violation. *Zucco*, 552 F.3d at 990.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety.

**RESPECTFULLY SUBMITTED** on April 7, 2026.

**WILENCHIK & BARTNESS, P.C.**

*/s/ Dennis I. Wilenchik*
Dennis I. Wilenchik, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

*/s/ Gregory F. Laufer*
Brad S. Karp, Esq. (admitted *pro hac vice*)
Susanna M. Buergel, Esq. (admitted *pro hac vice*)
Gregory F. Laufer, Esq. (admitted *pro hac vice*)
Alison R. Benedon, Esq. (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019-6064
bkarp@paulweiss.com
sbuergel@paulweiss.com
glaufer@paulweiss.com
abenedon@paulweiss.com

*Attorneys for Defendants
Mark A. Russell and Michael Lohscheller*

18

## L.R. CIV. 12.1(C) CERTIFICATION

Pursuant to L.R. Civ. 12.1(c), I certify that counsel for Defendants notified the opposing party of the issues asserted in this Motion during a video conference on April 6, 2026, and the parties conferred, but were unable to agree that the pleading was curable in any part by a permissible amendment offered by the pleading party.

**RESPECTFULLY SUBMITTED** on April 7, 2026.

**WILENCHIK & BARTNESS, P.C.**

*/s/ Dennis I. Wilenchik*
Dennis I. Wilenchik, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

*/s/ Gregory F. Laufer*
Brad S. Karp, Esq. (admitted *pro hac vice*)
Susanna M. Buergel, Esq. (admitted *pro hac vice*)
Gregory F. Laufer, Esq. (admitted *pro hac vice*)
Alison R. Benedon, Esq. (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019-6064
bkarp@paulweiss.com
sbuergel@paulweiss.com
glaufer@paulweiss.com
abenedon@paulweiss.com

*Attorneys for Defendants*
*Mark A. Russell and Michael Lohscheller*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2026, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/ Christine M. Ferreira*